RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 25a0287p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

UNITED STATES OF AMERICA,

                *Plaintiff-Appellee*,

    *v.*

DEVIN LONG,

                *Defendant-Appellant*.

No. 24-3377

─────────────────

Appeal from the United States District Court for the Northern District of Ohio at Cleveland.
No. 1:23-cr-00284-3—Patricia A. Gaughan, District Judge.

Decided and Filed: October 17, 2025

Before: READLER, MURPHY, and BLOOMEKATZ, Circuit Judges.

─────────────────

## COUNSEL

**ON BRIEF:** Dennis G. Terez, Beachwood, Ohio, for Appellant. Colleen Egan, UNITED STATES ATTORNEY'S OFFICE, Cleveland, Ohio, for Appellee.

    READLER, J., delivered the opinion of the court in which MURPHY, J., joined. BLOOMEKATZ, J. (p. 10), delivered a separate opinion concurring in the judgment.

─────────────────

## OPINION

─────────────────

    READLER, Circuit Judge. As they surveilled Devin Long, officers observed him engage in several suspected drug transactions. Based on these discoveries, a magistrate judge issued a warrant to search Long's house for evidence related to drug trafficking. The search turned up a host of illegal firearms and drugs. Long later moved to suppress the fruits of the search. After

the district court rebuffed that effort, Long pleaded guilty to two federal drug charges and two federal firearms charges.

Long's plea agreement preserved his right to appeal the district court's denial of his motion to suppress. He now exercises that right. But because the affidavit underlying the search warrant provided probable cause justifying the warrant, we affirm.

I.

Drug Enforcement Administration task force officers began surveilling Isiah Crenshaw based on information received from a confidential source. The source explained that Crenshaw was part of a methamphetamine, fentanyl, and cocaine trafficking ring. To further their investigation, officers set up three controlled buys from Crenshaw, the last of which brought Long into view. That buy unfolded as follows: After the buyer contacted Crenshaw, Crenshaw told the buyer that he was still waiting on his supplier to provide Crenshaw with the drugs. Less than half an hour later, officers witnessed Long and Isiah Hall enter a house on 52nd Street that Crenshaw frequented. Crenshaw arrived soon thereafter before departing for the controlled buy. Later, after the buy took place, officers saw Crenshaw meet Long and Hall in a parking lot, at which point Crenshaw handed Hall through a car window what investigators believed to be the proceeds from the sale. Officers then tailed Long, seeing him drive to a house on 46th Street and, thereafter, to a Family Dollar store, where he engaged in what the officers believed was another drug deal.

A little over two weeks later, the officers set up a controlled buy with Hall. Around the time that the buy was to take place, Long was at the 46th Street house. Upon receiving a phone call from Hall, Long traveled to the house on 52nd Street to meet with Crenshaw and Hall. This time, Long showed up with an orange bag. But when he left a short time later, he did not have the bag with him. Where did the bag go? The confidential source saw it roughly 40 minutes later in Hall's car when Hall arrived at the controlled buy. Inside the bag was the methamphetamine Hall sold to the confidential source. Based on this discovery, the officers believed Hall had called Long to deliver to him the methamphetamine Hall needed for the controlled buy.

The following week, officers observed Long parked in his car in front of a different house, one located on 35th Street. The 35th Street house, officers learned, was Long's registered address with the Ohio Adult Parole Authority. Long was required to register with this state agency due to a prior conviction for drug trafficking and drug possession. While Long was sitting in his car, an unknown man approached, took something from Long, and then walked down the street to hand the item to an individual in a different car. The man then returned to Long's car. When Long later left his car, officers witnessed him put something in his jacket pocket before directly entering his home.

Over the next week, Long repeatedly parked his car in front of either his home or the 46th Street house. From a search of the latter house's trash, officers believed it to be a drug stash house where Long would keep drugs, while he would store the proceeds of his trafficking at his home. Based on this information as well as additional surveillance of Long's associates, a federal magistrate judge granted a warrant authorizing a search of Long's 35th Street home for evidence of a crime, contraband, and any property that might be used in a drug trafficking conspiracy. Upon searching the home, officers found methamphetamine, fentanyl, cocaine, acetylfentanyl, psilocyn, cutting agents, six firearms, ammunition, and firearm magazines. Based on this evidence, Long was indicted on federal conspiracy, drug, and firearm charges.

Long filed a motion to suppress the evidence seized at his home. He argued that the officer affidavit underlying the warrant failed to establish a "sufficient nexus between the criminal activity alleged and the residence searched." R. 34, PageID 328. When the district court denied Long's motion, he pleaded guilty to four of the charges, reserving his right to appeal the suppression issue. The court sentenced him to 15 years. Invoking his appellate right, Long now contests whether there was probable cause to support a search of his home.

II.

The Fourth Amendment requires "probable cause" for "Warrants [to] issue." U.S. CONST. amend. IV. Violations of the Amendment's probable cause requirement can result in evidence being suppressed. *See Weeks v. United States*, 232 U.S. 383, 398 (1914). In examining a district court's ruling on a motion to suppress, we review the court's factual findings for clear

error and its legal conclusions de novo.  *United States v. Simmons*, 129 F.4th 382, 386 (6th Cir. 2025) (citing *United States v. Taylor*, 121 F.4th 590, 594 (6th Cir. 2024)).  But in so doing, we are cognizant that "[t]he probable cause determination takes place on the front lines" of our judicial system, and, accordingly, we, along with the district court, must afford "great deference" to the issuing judge's decision.  *United States v. Sanders*, 106 F.4th 455, 461 (6th Cir. 2024) (en banc) (quoting *United States v. Christian*, 925 F.3d 305, 311 (6th Cir. 2019) (en banc)).  Accordingly, when it comes to an issuing judge's determination that probable cause existed to justify a warrant, our focus is on whether the judge either acted arbitrarily in issuing the warrant or instead had a "substantial basis" for his probable cause conclusion.  *Id.*  We also bear in mind that probable cause lacks a precise mathematical formulation.  *See Maryland v. Pringle*, 540 U.S. 366, 371 (2003) (citing *Illinois v. Gates*, 462 U.S. 213, 235 (1983)).  As a result, probable cause is a product of "the totality of the circumstances," *id.*, and depends in part on whether "there is a fair probability that contraband or evidence of a crime will be found in a particular place," *Gates*, 462 U.S. at 238.  We refer to this latter notion as the "'nexus' between the place to be searched and the evidence sought."  *United States v. Sheckles*, 996 F.3d 330, 340 (6th Cir. 2021) (citing *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004) (en banc)).

With these principles in mind, turn to the probable cause nexus undergirding the search warrant for Long's home.  The district court's denial of Long's motion to suppress is consistent with both our "known drug dealer" precedents and our precedents about drug transactions right outside a suspect's home.

A.1.  Start with our known drug dealer cases.  Those cases recognize that a probable cause nexus exists when an affidavit establishes two things:  one, that the address to be searched is the home of the suspect, and, two, that the suspect is engaging in continual and ongoing drug trafficking operations.  *See Sanders*, 106 F.4th at 462.  When an officer's affidavit demonstrates as much, it provides circumstantial evidence of a nexus between the suspect's home and his criminal activity to justify a search of the home.  *Simmons*, 129 F.4th at 389.  By and large, this understanding confirms what common sense already tells us:  Drug dealers often choose their homes as secure locations to store their merchandise, profits, and other evidence of their trade.

*See Sanders*, 106 F.4th at 465 (quoting *United States v. Spencer*, 530 F.3d 1003, 1007 (D.C. Cir. 2008) (Kavanaugh, J.)).

*Simmons* demonstrates this principle in practice. There, we relied on our longstanding known drug dealer jurisprudence recognized in *Sanders* to hold that there was probable cause to search Simmons's home even in the absence of direct evidence that Simmons was dealing or storing drugs there. *Simmons*, 129 F.4th at 391. An investigation revealed that Simmons would often go to and from a different house when conducting drug deals before eventually returning to the home he had listed with federal probation services. *Id.* at 384. Although there was no direct evidence of Simmons dealing drugs from his home, because Simmons was engaging in continual and ongoing drug trafficking (albeit from another house), there was sufficient circumstantial evidence to establish probable cause to search his primary residence. *Id.* at 389; *see also United States v. Higgins*, 141 F.4th 811, 815 (6th Cir. 2025) (citing *Sanders*, 106 F.4th at 466) ("Higgins resided there . . . . That fact, coupled with evidence of Higgins's continual drug dealing, alone suffices to provide probable cause to search the apartment.").

This line of cases dooms Long's claim on appeal. Start with the fact that the officers knew the house at issue was Long's residence (and said so in the affidavit) because Long had voluntarily given that address to the Ohio Adult Parole Authority as his residence. When a suspect tells the government a particular address is his residence, we take him at his word. *See Simmons*, 129 F.4th at 389.

The affidavit also established that Long's drug trafficking was ongoing, continuous, and even tied to his home. Law enforcement saw him travel to a house to meet Crenshaw, a suspected drug dealer, immediately before a controlled buy. Next, they observed Crenshaw give what officers believed were the proceeds of that buy to Hall in Long's presence. Then, they witnessed Long complete what looked like another drug deal after visiting a drug stash house. Weeks later, officers saw Long give Hall an orange bag that they believed contained methamphetamine for Hall to use in another controlled buy. They also witnessed Long engage in what looked like a drug deal in front of his home. While not required by our known drug dealer cases, this case, unlike some others, thus includes a direct connection tying Long's drug dealing to his home. *Cf. id.*; *Sheckles*, 996 F.3d at 341–42. Finally, in the week before the

officers obtained the search warrant, they observed numerous instances of Long driving between his home and the known stash house. So, like *Simmons*, the officers had evidence of Long regularly traveling to and from stash houses to carry out drug deals. *See* 129 F.4th at 389. That makes his trafficking "regular and ongoing." *Id.* at 387.

And then add to the mix the other relevant observations in the affidavit. It describes the officer affiant's training and experience, including his knowledge that drug traffickers often keep incriminating records of their activities at home. This "experience that drug dealers keep evidence of dealing at their residence" is "an additional reason to find probable cause" here. *United States v. Reed*, 993 F.3d 441, 452 (6th Cir. 2021) (quoting *United States v. Sumlin*, 956 F.3d 879, 886 (6th Cir. 2020)). Considering the totality of the circumstances, the affidavit established that Long was a known drug dealer engaged in ongoing trafficking operations who lived at the home to be searched, a location where, experience and common sense teaches, evidence was likely to be found. That is quintessential probable cause.

2. Long resists our holding that he was a known drug dealer. He first argues that the affidavit failed to connect his drug trafficking to his home. He admits that "paragraphs and paragraphs [of the affidavit] are spent detailing how [he] is involved with drug dealing." Appellant Br. 26. But, Long says, "never is [his house] involved" in these deals. *Id.* He is mistaken because one of the transactions occurred right outside his home.

Besides, this argument is at odds with the understanding in our known drug dealer cases that the affidavit merely had to establish that the house in question was Long's residence, and that he was engaging in continual and ongoing drug trafficking, irrespective of whether direct evidence exists of trafficking involving his home. *See Sanders*, 106 F.4th at 466 (quoting *Sheckles*, 996 F.3d at 342). Nor is Long correct in saying that "[w]hose evidence it is and whose place it is should stay out of the [probable cause] equation." Appellant Br. 26. The crux of our known drug dealer cases is that a magistrate judge can rely on common sense and the experience of law enforcement to conclude that "there is a fair probability that contraband or evidence of a crime will be found" in a home when that home belongs to an active drug trafficker. *Gates,* 462 U.S. at 238.

Even so, says Long, he is not a known drug dealer. When the investigation began, he notes, law enforcement did not know who he was. Yet that makes no difference. We have never held that a drug dealer must be known before an investigation begins. *See, e.g.*, *United States v. Kenny*, 505 F.3d 458, 460–62 (6th Cir. 2007) (upholding a known drug dealer search when the suspect's identity was discovered during a raid on a drug lab). A contrary rule would be unworkable and illogical. How would judges define when an investigation began? Or ended? Here, for example, officers could have classified this as one investigation (as they did) or multiple, separate investigations (one for Crenshaw, one for Hall, and one for Long). It makes little sense to have known drug dealer cases turn on such an empty formality.

Next, Long argues that the affidavit failed to establish that the home to be searched was his residence. This argument falters from the start. The affidavit identified the home as Long's residence based on information Long himself gave to the government as part of his parole. When a suspect who is on parole provides his residence's address to the government, he cannot complain that the affidavit failed to prove he lived there. *See Simmons*, 129 F.4th at 389. To the extent Long claims he actually resided somewhere else, a conclusion he says is consistent with observations detailed in the affidavit, Long should have informed the state parole authority of his change of residency. As *Simmons* makes clear, for purposes of a warrant affidavit, Long's listing of an address with a parole authority is enough to establish his residence, regardless of the other observations the affidavit might contain. *See id.* Plus, the mere fact that another location might be one of Long's residences does not diminish the probability that this house was as well. *See Sanders*, 106 F.4th at 466–67 (citing *United States v. Stearn*, 597 F.3d 540, 560 (3d Cir. 2010)). In other words, the rest of the affidavit cannot undermine what Long has already admitted to the state of Ohio.

Finally, Long attacks the affidavit by pointing to facts it did not contain. These include the quantity of drugs being sold, more criminal history tying Long to drug related crimes, evidence of international drug trafficking, and evidence of what was inside the house by an eyewitness like a confidential informant. We review affidavits based on what they embody, however, not what they lack. *United States v. Allen*, 211 F.3d 970, 975 (6th Cir. 2000) (en banc). True, the facts Long highlights can be relevant to the probable cause analysis. Yet none of our

cases suggest those facts are necessary before one may justify a probable cause finding.  *See, e.g.*, *Simmons*, 129 F.4th at 387–88 (illustrating different ways officers can establish known drug dealer status); *see also Sanders*, 106 F.4th at 464 (pointing to a confidential informant's tip as supporting a finding of probable cause but not necessary to the ultimate holding in that case); *United States v. Florence*, 150 F.4th 773, 778–79 (6th Cir. 2025) (holding that a single drug transaction was sufficient for probable cause).  Put another way, while the missing facts Long highlights might, if present, bolster our decision, their absence does not undercut it.

B.  Looking at this issue from a different angle confirms the same result.  The lone transaction outside Long's home may well have provided an independent basis for finding probable cause to search it separate from his other drug trafficking.  *See United States v. Berry*, 565 F.3d 332, 339 (6th Cir. 2009) (collecting cases).  Observed drug deals around the residence connect the dealer to the residence in a manner sufficient to establish the required nexus between the home and the illicit activity.  *See United States v. Ellison*, 632 F.3d 347, 349 (6th Cir. 2011).  As we have repeatedly reaffirmed, the "commission of a drug transaction outside of a house and one participant's walking back into the house" satisfies "the probable cause requirement" justifying a search of the house.  *United States v. White*, 990 F.3d 488, 490–91 (6th Cir. 2021) (citation modified).  So when officers have evidence of even one drug deal immediately outside of the home of a dealer, there is probable cause to search the home.  *See Ellison*, 632 F.3d at 349.

That is what happened here.  The affidavit stated that Long parked in front of his home and handed something to an unknown man.  That man then walked down the street and handed an item to the driver of another car.  He then came back to Long's car and sat there for a few minutes before leaving, at which point Long exited the car and went into his home.  The officers' training, experience, and common sense gave them a firm basis to believe that a drug deal had just taken place in front of Long's home.  And, again, even one drug deal outside of the home can establish probable cause, especially when the dealer immediately returns to the home after the deal is complete.  *See Ellison*, 632 F.3d at 349.  So when combined with Long's ongoing drug operations, his apparent drug deal in front of his home, clears the "not . . . high bar" of probable cause by a wide margin.  *Kaley v. United States*, 571 U.S. 320, 338 (2014).

Long likewise takes issue with our conclusions concerning the evidence of the drug deal occurring outside his home. According to Long, the alleged drug deal at his residence is too speculative to support a finding of probable cause. He offers a variety of hypotheticals that he says show why the officers did not have probable cause. He imagines, for instance, what if the government thought Long was running credit card fraud, ransomware, or embezzlement schemes, and officers saw him hand something to someone in a car outside of his house. Would that be enough for probable cause? The short answer to this rhetorical question is likely "yes." Suppose law enforcement officials suspected Long was engaging in a ransomware scheme after they observed him repeatedly visit homes of other members of a ransomware conspiracy. These individuals were producing and distributing ransomware, and Long himself appeared to be collaborating in these deals to sell ransomware. Then, witnessing Long engage in a transaction outside of his house that looked like a ransomware sale based on the officers' experience and training would be enough.

Long disputes the point by highlighting some alternative, innocent explanations for his conduct, including that he could have been returning "a set of car keys" instead of handing off contraband. Reply Br. 2. But a judge need not rule out all alternative explanations before issuing a search warrant. *See White*, 990 F.3d at 492–93. All that is necessary is a "'fair probability' or a 'common-sense' inference" that evidence of criminal activity will be found. *Id.* at 492 (quoting *Gates*, 462 U.S. at 238). As we have explained, "Probable cause does not demand resolving each jot and tittle of metaphysical doubt." *Id.* (citing *Florida v. Harris*, 568 U.S. 237, 243–44 (2013)). Long's explanation ignores the common-sense reality of what the officers observed. Pulling up in front of your house, handing car keys to a middleman who then walks down the street to give them to someone in another car, and sitting in your car with the middleman for a while afterward would be an odd way to return a set of keys. Yet that behavior is entirely consistent with a drug deal. The facts in the affidavit, therefore, provide a stronger basis for probable cause than the strawmen hypotheticals Long constructs.

\* \* \* \* \* \*

We affirm the district court's denial of the motion to suppress.

—————————————

**CONCURRENCE**

—————————————

BLOOMEKATZ, Circuit Judge, concurring in the judgment. I agree with the majority opinion that the warrant in this case was supported by probable cause and, therefore, would also affirm the district court's denial of Devin Long's motion to suppress. But I do not join the majority opinion's segmented probable cause analysis. The Supreme Court has instructed us to assess probable cause based on the "totality of the circumstances." *Maryland v. Pringle*, 540 U.S. 366, 371 (2003); *see also Illinois v. Gates*, 462 U.S. 213, 230–32 (1983). Although acknowledging this precedent, the majority opinion separates out the facts and looks at them from "different angle[s]," and it asks whether subsets of the facts can provide "an independent basis" or even are "required" for probable cause. Maj. Op. at 4, 5, 8. But whether the warrant could hypothetically be supported by less indicia that contraband would be found in Long's house is not something we need to decide, so I wouldn't. Instead, I would affirm because all the facts together in the warrant affidavit demonstrate a "fair probability" that officers would find contraband in Long's house. *Gates*, 462 U.S. at 238.